UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID L. BEESON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   1:03-cv-1472-DFH-TAB |
| | ) |
| INDIANA BELL TELEPHONE CO., INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction.**

Four years after being diagnosed with multiple sclerosis, Plaintiff David L. Beeson realized that his progressive condition would not allow him to work. On January 25, 2001 Beeson, an employee with Defendant Indiana Bell,[1] began a medical leave of absence under Indiana Bell's STD policy. Beeson exhausted all available STD benefits on April 21, 2002. When Indiana Bell determined that none of its leave policies or provisions in the CBA entitled Beeson to continued employment, it removed him from its payroll in May 2002.

Beeson filed this action claiming that Indiana Bell's termination of his employment

---

[1] For the purpose of this entry, "Indiana Bell" refers to Indiana Bell Telephone Co., Inc., "the Union" refers to the Communication Workers of America, Local 4900, "STD" refers to Short Term Disability, "LTD" refers to Long Term Disability, "CBA" refers to the collective bargaining agreement, and "CBA Excerpts" refers to portions of the 2001-04 CBA.

violated section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185.[2] Indiana Bell filed for summary judgment arguing that Beeson can show neither that Indiana Bell breached the collective bargaining agreement nor that the Union breached its duty of fair representation as it must do to sustain a hybrid action under section 301.

For the reasons set forth below, the Magistrate Judge recommends that Indiana Bell's motion for summary judgment be GRANTED.

## II.     Summary Judgment Standard.

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Butera v. Cottey, 285 F.3d 601, 605 (7th Cir. 2002). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Abrams v. Walker, 307 F.3d 650, 653 (7th Cir. 2002), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must construe all facts and draw all reasonable inferences in a light most favorable to the non-moving party. Butera v. Cottey, 285 F.3d 601, 605 (7th Cir. 2002).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Michael v. St. Joseph County,

---

[2] Beeson originally named the Union as a co-defendant claiming that it breached its duty of fair representation during his grievance. Prior to Indiana Bell's motion for summary judgment, Beeson abandoned his claim against the Union. [Docket Nos. 30 and 32].

259 F.3d 842, 845 (7th Cir. 2001).  To successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts.  See Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001).  A scintilla of evidence in support of the non-movant's position is not sufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252.

### III.     Background.[3]

#### A.     Employment with Indiana Bell.

Beeson began working for Indiana Bell in 1979.  [Beeson Dep. pp. 27-28, 31-32].  For the majority of his employment he worked as a customer services specialist installing telephone lines to residences and businesses.  [Beeson Dep. p. 32].  The daily physical demands of Beeson's position included climbing twenty- to thirty-foot telephone poles, crawling, lifting sixty to seventy pounds, and wearing a twenty-pound tool belt.  [Beeson Dep. pp. 33, 40-41, 44-46].

Beeson was a member of the Union during his employment with Indiana Bell.  [Beeson Dep. p. 29].  Preceding his discharge, Beeson enjoyed an amicable relationship with the Union and had no complaints about its representation of him.  [Beeson Dep. pp. 30, 95-97, 215-16]. For ten of his twenty-one years with Indiana Bell, he worked alongside Union Representative Ron Davenport, and Beeson considered Davenport his friend.  [Beeson Dep. p. 30].  Davenport was helpful during Beeson's employment at Indiana Bell.  [Beeson Dep. p. 97].  For example,

---

[3] The facts are either undisputed or viewed in a light most favorable to Plaintiff, the non-moving party.  In addition, this background section is a brief overview of the facts, not an exhaustive recitation of all material facts.

Davenport helped Beeson obtain a desirable transfer to a less physical job in July 2001. [Beeson Dep. pp. 95-97].

In 1997, Beeson was diagnosed with multiple sclerosis. [Beeson Dep. pp. 64-65]. By January 25, 2001 Beeson's condition precluded him from working and necessitated a medical leave of absence under Indiana Bell's STD policy. [Beeson Dep. pp. 78-79].

### B. Indiana Bell's STD Policy.

Indiana Bell provides employees such as Beeson STD and LTD benefits. [Reinhart Decl. ¶ 2]. It distributes a summary of these benefit plans to each employee. [Beeson Dep. p. 52, Ex.11; Reinhart Decl. ¶ 2, Ex. A]. Beeson received these summaries during his employment with Indiana Bell. [Beeson Dep. p. 52; Reinhart Decl. ¶ 2].

Indiana Bell's STD policy allows each non-management employee up to fifty-two weeks of disability benefits for a qualifying event. [Beeson Dep. pp. 52, 210, Ex. 11, pp. 5-6]. Pursuant to this policy, an employee's STD benefits begin after an employee is unable to work for seven consecutive days and end either once the employee is able to return to work or at the conclusion of fifty-two weeks, whichever is earlier. [Beeson Dep. p. 52; Ex. 11, pp. 5-6]. If an employee requires more than one leave period, the fifty-two-week clock is not reset until the employee has returned to work for thirteen or more weeks. [Beeson Dep. pp. 102-04; Decl. Reinhart, ¶ 2, Ex. A, p. 7]. If an employee is physically unable to return to work with or without a reasonable accommodation at the end of his or her fifty-two weeks of STD leave, Indiana Bell removes the employee from its payroll. [Reinhart Decl. ¶ 3; Putnam Decl. ¶ 2; Beeson Dep. pp. 52, 163-64, Ex. 11, p. 6].

## C. Rights under the Collective Bargaining Agreement.

In 2001, Indiana Bell and the Union ratified the collective bargaining agreement that was in place at the time of Beeson's discharge. [Beeson Dep. pp. 191-92; CBA Excerpts, pp. 25, 33-39, and 43]. Section twelve of the CBA sets forth a three-step grievance process. [Beeson Dep. pp. 191-92; CBA Excerpts, pp. 33-39]. Steps one and/or two may be bypassed upon mutual agreement. [Beeson Dep. pp. 191-92; CBA Excerpts, p. 36]. If not bypassed, step one mandates that the aggrieved individual's immediate supervisor must meet with the Union regarding the grievance. [Beeson Dep. pp. 191-92; CBA Excerpts, pp. 35-36]. If the grievance proceeds or is bypassed to step two, the next higher member of management meets with the Union. [Beeson Dep. pp. 191-92; CBA Excerpts, pp. 35-36]. Indiana Bell is required to provide the Union with its step two answer within fifteen days of the meeting. [Beeson Dep. pp. 191-92; CBA Excerpts, p. 35]. The Union may appeal this answer within thirty days. [Beeson Dep. pp. 191-92; CBA Excerpts, p. 35].

If the grievance is appealed to step three, the matter is forwarded to the senior manager of labor relations. [Biehl Decl. ¶ 6; Beeson Dep. pp. 191-92; CBA Excerpts, p. 35]. The senior manager of labor relations must then meet with the Union and provide Indiana Bell's answer within fifteen days of the step three meeting. [Beeson Dep. pp. 191-92; CBA Excerpts, pp. 35-36]. If the grievance remains unresolved at the conclusion of the three-step process, either the Union or Indiana Bell may request arbitration. [Beeson Dep. pp. 191-92; CBA Excerpts, p. 37].

Article 16 of the collective bargaining agreement pertains to Indiana Bell's benefit plans. [CBA Excerpts, p. 43]. Section 16.04 of the CBA states, "Neither the Benefit Plans, nor their administration shall be subject to the grievance or arbitration procedures of this Agreement."

[CBA Excerpts, p. 43].

        **D.**       **Events Leading up to Beeson's Discharge.**

Beeson's STD benefits commenced on February 1, 2001 and continued until he returned to work on July 15, 2001. [Beeson Dep. pp. 77, 83-84, and 89-90]. To accommodate his condition, Beeson requested and Indiana Bell granted him a transfer to another CSS position at that time. [Beeson Dep. pp. 91-97].

Beeson's deteriorating condition necessitated a second STD leave approximately ten weeks later on September 25, 2001. [Beeson Dep. pp. 101-02]. Beeson's benefits began on October 1, 2001. [Beeson Dep. p. 101]. Because Beeson had not returned to work for thirteen consecutive weeks before taking his second STD leave, Indiana Bell considered the later STD period a continuation of his first. [Beeson Dep. pp. 102-04; Reinhart Decl. ¶ 2, Ex. A, p. 7].

In December 2001, while Beeson remained on STD, Beeson's doctor issued permanent work restrictions. [Beeson Dep. pp. 106-07, Ex. 27]. These restrictions prevented Plaintiff from: (1) lifting anything greater than twenty pounds; (2) being exposed to unprotected heights; (3) climbing ladders and poles, except in rare circumstances; (4) working at heights for more than one hour per day; and (5) wearing a tool belt for longer than four hours per day. [Beeson Dep. pp. 106-07, Ex. 27].

In January 2002 Indiana Bell's associate director of job accommodations, Carla Putnam, contacted Beeson regarding his permanent restrictions. [Putnam Dep. pp. 140-43]. During this conversation, Beeson stated that his restrictions would prevent him from performing the essential functions of his position. [Beeson Dep. p. 177; Putnam Dep. p. 141]. Beeson further informed Putnam that he wanted to discuss the restrictions with his doctor. [Beeson Dep.

p. 177; Putnam Dep. pp. 141-42]. In February 2002 the outside vendor that administers Indiana Bell's STD benefits, SMAART, forwarded Beeson's revised permanent restrictions to Putnam. [Putnam Dep. p. 147]. These revised restrictions prohibited Beeson from: (1) lifting anything greater than forty-five pounds; (2) being exposed to unprotected heights more than occasionally; (3) climbing poles more than occasionally; (4) working at heights for greater than four hours per day; and (5) wearing a tool belt for longer than six hours per day. [Beeson Dep. pp. 117-19, Ex. 28]. These revised restrictions also precluded Beeson from performing the essential functions of the CSS position. [Beeson Dep. p. 128].

On February 25, 2004 Beeson returned to work for the final time.[4] Four days after his return, Beeson experienced a relapse in his physical symptoms, and on March 1, 2002 he resumed STD leave. [Beeson Dep. pp. 136-37]. Because he had not been back to work for more than two weeks, Beeson's STD benefits began immediately. [Reinhart Dep. ¶ 2, Ex. A, p. 7; Beeson Dep. p. 52]. As before, Beeson's fifty-two week STD clock did not reset because his return to work did not last thirteen weeks or more. [Reinhart Dep. ¶ 2, Ex. A, p. 7].

Plaintiff exhausted his fifty-two weeks of STD benefits on April 21, 2002. [Beeson Dep. pp. 158-59, Ex. 30; Biehl Dep. pp. 135-36]. At the time his STD benefits expired, Beeson was experiencing extreme fatigue and weakness. [Beeson, pp. 140-42, Ex. 73]. On April 23, 2002 Beeson informed SMAART he was unable to return to work. [Beeson Dep. pp. 150-52; Reinhart Dep. ¶ 6, Ex. D].

---

[4] Beeson began Indiana Bell's Medical Priority Placement Program, a ninety-day program in which an employee is tested to determine whether he or she is qualified to perform the essential job duties of any open position with or without reasonable accommodation. [Beeson Dep. pp. 127-30; Putnam Dep. pp. 71-72, 199-222].

7

Shortly before the expiration of Beeson's STD leave, his supervisor, Frank Carmen telephoned senior manager of labor relations Grace Biehl to inform her he had received notice Beeson soon would be removed from Indiana Bell's payroll due to the expiration of his STD benefits. [Biehl Dep. pp. 100, 110-11, 114]. Biehl investigated all options for Beeson by, among other things, reviewing the 2001-04 collective bargaining agreement to see if it contained any provisions that would govern Beeson's situation. [Biehl Dep. pp. 113, 115-16, 120-21].

Biehl determined that Section 16.04 rendered the CBA inapplicable to Beeson's removal from Indiana Bell's payroll. [Biehl Dep. pp. 113, 115-16, 120-21, 190]. Biehl and Beeson's area manager, John Mitchell, agreed to contact the Union to discuss Beeson's employment status prior to removing him from the payroll. [Biehl Dep. pp. 121-22, 127-28; Mitchell Decl. ¶ 4]. Biehl contacted Union vice president Billy Floyd, treasurer Pam Siefers, representative Ron Davenport, and president Larry Woods prior to taking any action against Beeson. [Biehl Dep. pp. 122-23].

Biehl completed her investigation in May 2002. [Biehl Dep. p. 142]. Based upon the information gathered during this investigation, Biehl concluded Indiana Bell had treated Plaintiff fairly and in accordance with the requirements of the CBA. [Biehl Decl. ¶ 4]. Biehl authorized Beeson's removal from the payroll, effective May 24, 2002. [Biehl Dep. pp. 142, 187-88, 192-93; Mitchell Decl. ¶ 4].

  **E. Union Response to Beeson's Discharge**.

Before removing Beeson from the payroll, Mitchell contacted the Union. [Mitchell Decl. ¶ 4; Biehl Dep. pp. 192-93]. On June 10, 2002, Beeson contacted the Union and spoke with Davenport. [Beeson Dep. Ex. 36, p. 1]. Davenport informed Beeson that the Union would be

submitting a grievance on his behalf. [Beeson Dep. Ex. 36, p. 1]. On June 12, 2002, the Union prepared and timely filed a grievance on Beeson's behalf. [Beeson Dep. pp. 190-91, Ex. 35]. The Union alleged that Indiana Bell had violated section 4.01 of the CBA by removing Beeson from the payroll. [Beeson Dep. pp. 190-91; Ex. 35]. Section 4.01 of the CBA states, in relevant part, "[t]he Company and the Union recognize that it is in the best interests of both Parties, the employees, and the public that all dealings between them be, and continue to be, characterized by mutual responsibility and respect." [Beeson Dep. pp. 191-92, Ex. 43, p. 25].

The Union and Indiana Bell mutually agreed to bypass step one of the grievance process. [Mitchell Decl. ¶ 5; Beeson Dep. pp. 190-91, Ex. 35]. Although not required by the CBA, the Union and Biehl met on June 26, 2002 prior to the step two meeting. [Mitchell Decl. ¶ 5]. During this meeting, the Union proposed that Plaintiff be reinstated and placed into Indiana Bell's medical priority placement program. [Mitchell Decl. ¶ 5, June 26, 2002, Minutes]. Additionally, the Union informed Indiana Bell that Beeson did not receive notice that his STD benefits were expiring until after they had expired. [Mitchell Decl. ¶ 5, June 26, 2002 Minutes]. The Union further expressed concern that Beeson would not likely qualify for LTD. [Mitchell Decl. ¶ 5, June 26, 2002, Minutes]. Biehl explained her investigation results and, on this basis, denied the Union's request to reinstate Beeson. [Biehl Decl. ¶ 5].

After the Union filed his grievance, Beeson corresponded with various members of the Union via telephone, e-mail, and certified mail. [Beeson Dep. pp. 200-12, 214, Ex. 37, 41]. On July 9, 2002 Beeson twice spoke with Woods. [Beeson Dep. Ex. 36, p. 2]. Woods hung up on Beeson during one of these conversations. [Beeson Dep. Ex. 36, p. 2]. Subsequent to these telephone conversations, the Union indicated that it would only communicate with Beeson via

9

certified mail and that Woods would be Beeson's designated contact for all future conversations. [Beeson Dep. Ex. 37].

Area manager Mitchell attended a step two meeting with Union representative Davenport in July 2002. [Mitchell Decl. ¶ 5]. During the meeting, Davenport asked Mitchell if the CBA provided any alternate means for recovery of Beeson's employment. [Mitchell Decl. ¶ 5]. In response, Mitchell cited section 16.04 and explained that Indiana Bell believed this provision rendered the matter beyond the scope of issues grievable under the CBA. [Mitchell Decl. ¶ 5]. Accordingly, Mitchell denied the grievance on August 1, 2002. [Mitchell Decl. ¶ 5; Beeson Dep. pp. 190-91, Ex. 35]. The Union did not challenge Indiana Bell's denial to step three. [Mitchell Decl. ¶ 5]. Beeson's grievance was not the first time the Union had declined to pursue a grievance to step three. [Biehl Dep. pp. 144, 188].

At least on one occasion, the Union explained to Beeson that Indiana Bell removed him from its payroll because he had exhausted his fifty-two weeks of STD benefits without returning to work. [Beeson Dep. pp. 200-12, 214, Ex. 41]. The Union recommended that Beeson pursue LTD benefits. [Beeson Dep. pp. 144, 166, 210-11, Ex. 41]. On August 12, 2004 the Union responded in writing to Beeson's request for information regarding his grievance. [Beeson Dep. pp. 200-214; August 12, 2004, Union Letter]. By this letter, the Union informed Beeson that Indiana Bell's benefit leave policies had been in place consistently for years and provided him with a copy of both the benefit plan language and relevant provisions of the CBA. [August 12, 2004, Union Letter]. The Union further advised Beeson to appeal his denial of long term disability and invited him to contact the Union if he wanted assistance with this appeal. [August 12, 2004, Union Letter]. This was the last time the Union and Beeson communicated regarding

this matter.

Beeson's physician did not release him for return to work until July 10, 2002. [Biehl Dep. Ex. 23].

**IV.     Rule 56 and Local Rule 56.1.**

Rule 56 of the Federal Rules of Civil Procedure provides the parties with an avenue to test the sufficiency of the claims and to determine whether there are disputes of material fact that require a trier of fact.  See Vukadinovich v. Board of School Trustees of North Newton School Corp., 278 F.3d 693, 699 (7th Cir. 2002) ("The primary purpose of summary judgment is to dispose of claims that have no factual support, and therefore, the nonmovant must respond with affidavits or otherwise, 'setting forth specific facts showing that there is a genuine issue for trial.'")  To this end, Local Rule 56.1 outlines the procedures in this district for presenting these issues to the Court for determination.  Again, the focus is on material facts.  See S.D. Ind. L.R. 56.1.  Local Rule 56.1 defines material facts as "facts potentially determinative of the motion . . . ."  See also Pike v. Caldera, 188 F.R.D. 519, 527 (S.D. Ind. 1999) ("[A] 'material' fact is a 'potentially outcome determinative' fact.").[5]

Rather than focus on material facts, Beeson has "dumped" numerous irrelevant facts unrelated to his underlying claim on the Court to sort out, much like the parties in Volovsek v. Wisconsin Dept. of Agriculture, Trade and Consumer Protection, 344 F.3d 680, 686 (7th Cir. 2003) ("the parties appear to have simply collected the sum total of all the unpleasant events in [the plaintiff's] work history since 1991, dumped them into the legal mixing bowl of this lawsuit,

---

[5] While decided under a former version of Local Rule 56.1, Pike's discussion of what constitutes a material fact is equally applicable under the current rule.

set the Title VII-blender to puree and poured the resulting blob on the court."). Sorting through the resulting "blob" not only takes time, it also distracts attention from Beeson's real claim.

More telling, Beeson also fails to respond to many, if not all, the facts asserted by Indiana Bell. While Local Rule 56.1 "does not require a nonmoving party to respond to each and every fact, point by point, it does require that the nonmoving party submit potentially determinative facts and identify factual disputes which the nonmoving contends precludes summary judgment." Rayl v. Decision One Mortg. Co., 2003 WL 21989992, *1 (S.D. Ind. Aug. 19, 2003). Beeson's brief, while containing a section titled "Statement of Material Facts in Dispute," contains no such disputed material facts. "While it is certainly proper, if not necessary, for a non-movant to submit additional, unresponsive facts when opposing a summary judgment motion, failure to respond to the movant's facts may be perilous to the non-movant's case. Indeed, the very language of L.R. 56.1(e) warns a non-movant that uncontroverted facts, properly supported by admissible evidence, will be assumed admitted by the Court." Id. Such is the case here.

**V.    Discussion.**

Because Beeson's breach of contract claim against Indiana Bell is "'inextricably interdependent'" with the breach of fair representation cause of action he originally advanced against the Union, Beeson's claim is properly characterized by both parties as a hybrid suit under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. McLeod v. Arrow Marine Transport, Inc., 258 F.3d 608, 613 (7th Cir. 2001) (quoting DelCostello v. Int'l Bhd.of Teamsters, 462 U.S. 151, 164-165 (1983)). See McKee v. Transco Products, Inc., 874 F.2d 83, 86-87 (2nd Cir. 1989) (noting that the nature of the claim, and not the naming of particular

parties, determines whether action is hybrid).  To survive summary judgment on his hybrid claim, Beeson must raise a triable issue of fact regarding whether the Union breached its duty of fair representation.  Neal v. Newspaper Holdings, Inc., 349 F.3d 363, 368-69 (7th Cir. 2003).

To sustain a claim that a union breached its duty of fair representation, a plaintiff must show that the offending union's actions were arbitrary, discriminatory, or in bad faith.  Id. at 369.  See also Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67-68 (1991).  "Each of these possibilities must be considered separately in determining whether or not a breach has been established."  Id.  A court will assess an allegation that a union's actions were arbitrary through an objective lens.  "'A union's actions are arbitrary only if the union's behavior is so far outside a wide range of reasonableness as to be irrational.'" Id. (quoting Filippo v. Northern Indiana Public Serv. Corp., 141 F.3d 744, 749 (7th Cir. 1998)).  Conversely, "whether or not a union's actions are discriminatory, or in bad faith calls for a subjective inquiry and requires proof of an improper motive."  Id.  Regardless of which lens he dons, Beeson does not sustain his summary judgment  burden.

      **A.**    **The Union's Decision Not to Pursue Beeson's Grievance was Rational.**

Beeson contends that the Union's actions with respect to his grievance were arbitrary in three respects.  First, Beeson asserts that the Union did not initiate his grievance expediently.  Second, he argues that the Union drafted his grievance in a perfunctory fashion.  Lastly, Beeson questions the Union's failure to challenge Indiana Bell's denial of his grievance beyond step two.  Indiana Bell conversely argues that the Union sufficiently investigated and prepared the grievance, filed it in a timely fashion, and evaluated its course of action in a rational manner.  While the parties certainly disagree with respect to the degree of vigor displayed by the Union

during Beeson's grievance, there is no dispute that the Union discussed Beeson's STD status with Indiana Bell, filled out the grievance form citing the basis for Beeson's challenge to his termination, submitted it within the time frame allotted by the CBA, and advocated Beeson's position to Indiana Bell at least twice before opting to drop the grievance. Subsequent to its decision to abandon the grievance, the Union responded to Beeson's request for information in writing.

Based on the record evidence, the Court cannot construe any of the Union's actions or failures to act as irrational. The Union's decision not to advance Beeson's grievance to the next level is not arbitrary for two reasons. First, a very colorable argument exists that the undisputed language in the CBA and the benefits provisions rendered Beeson's grievance futile. Even if this Court believed that the Union was mistaken in its interpretation of the CBA language, this Court cannot usurp the Union's interpretation for its own. This is so because the law affords unions "room to make discretionary decisions and choices, even if those judgements are ultimately wrong." McLeod, 258 F.3d at 613. Second, Beeson proffers no evidence that the Union treated substantially similar grievances more favorably than it did Beeson's grievance. See McKelvin v. E.J. Brach Corporation, 124 F.3d 864, 868 (7th Cir. 1997).

Further, Beeson's own testimony is most revealing: "I don't think they [the union] put their best foot forward on representing me." [Beeson Dep. p. 216]. Unfortunately for Beeson, his own testimony exposes a fatal flaw in this case. Beeson does not complain that the Union refused to represent him or engaged in a course of action that prejudiced his grievance. Instead, Beeson bemoans, in essence, that the Union failed to represent him with its utmost diligence. Lack of diligence, however, does not rise to the level of a breach of the duty of fair

representation.  <u>Cote v. Eagle Stores, Inc</u>. 688 F.2d 32, 34 (7th Cir. 1982).  In the absence of any evidence that the Union treated other similar grievances in a preferential manner, and faced with an abundance of evidence demonstrating the rational basis behind its decision to abandon Beeson's grievance, the Union's actions were not arbitrary.  <u>See</u> <u>also</u> <u>Konen v. Int'l Brotherhood of Teamsters</u>, 255 F.3d 402, 407-08 (7th Cir. 2001) (union's refusal to arbitrate grievance was rational in light of information it possessed concerning employee's conduct at the time it made its decision not to proceed to arbitration).

        **B.**       **The Union Treated Beeson Fairly and in Good Faith.**

Beeson's contentions that the Union discriminated against him or processed his grievance in bad faith fares no better than his claim that the Union's conduct was arbitrary.  As discussed above, the record is void of any facts supporting the conclusion that the Union treated any other similarly situated employees' grievance preferentially.  As a result, Beeson's claim that the Union discriminated against him necessarily fails as a matter of law.

In support of his allegation that the Union acted in bad faith, Beeson cites to four pieces of evidence: (1) the Union's position that Beeson pursue LTD benefits; (2) the Union's request that Beeson communicate only by certified letter; (3) the conversation during which Union President Woods hung up on Beeson; and (4) the Union's August 12, 2002, written response to Beeson's request for information.  Again, Plaintiff's evidence falls woefully short of its mark.  While Woods and/or the Union may have been rude to Beeson, rudeness or even outright hostility are not indicative of bad faith in this Circuit.  <u>Souter v. International Union, United Auto., Etc. Local 72</u>, 993 F.2d 595, 598-99 n.3 (7th Cir. 1993).  None of the evidence Beeson points to sufficiently sustains his burden of showing bad faith because Beeson has produced no

15

evidence suggesting that these things affected the Union's representation of his interests. See McKelvin, 124 F.3d at 869. In fact, the evidence in this case -- some of it proffered by Beeson -- demonstrates the Union's good faith efforts on Beeson's behalf with respect to his grievance. Specifically, the Union's pre-grievance effort to obtain a desirable transfer for Beeson in 2001 coupled with its post-grievance invitation to Beeson to contact its own representative for assistance appealing the denial of LTD belie any inference of improper motive with respect to the Union's decisions.

In short, Beeson can not raise a genuine issue regarding whether the Union breached its duty of fair representation.[6] Beeson's inability to demonstrate such dictates, as a matter of law, that he can not sustain his claim that Indiana Bell violated section 301 when it removed him from its payroll.

**VI.  Conclusion.**

For the reasons stated above, the Magistrate Judge recommends that Defendant Indiana Bell's motion for summary judgment be GRANTED and that this action be dismissed with prejudice.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1), and failure to file timely objections within

---

[6] Because the Court finds that Beeson can not raise a triable issue of fact regarding the Union's duty of fair representation, the issue of whether Bell Telephone complied with the collective bargaining agreement is moot and discussion of that issue is not necessary.

the ten days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated: 08/29/2005

_____
Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Copies to:

Kenneth J. Yerkes
Stephanie A.H. Blackman
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204

Michael C. Kendall, Esq.
KENDALL HAHN
220 North Range Line Road
Carmel, IN 46032